IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ENRIQUE CRUZ, JR.,

                Plaintiff,

    v.                                                                OPINION and ORDER

CITY OF ADAMS, SAM WOLLIN, and                          25-cv-120-jdp
RICHARD SMITH

                Defendants.

---

City of Adams police officers Sam Wollin and Richard Smith went to plaintiff Enrique Cruz, Jr.'s house to investigate a welfare check call that they believed might be related to a suspect who had fled the scene of a fatal car crash accident the night before. Wollin went into Cruz's backyard, purportedly to prevent the suspect from fleeing. Cruz came outside to ask Wollin to leave and Wollin asked for Cruz's identity. When Cruz refused to give it, Wollin handcuffed him, frisked him, and detained him in a squad car for several minutes, releasing him only after another resident of the house told the officers Cruz's real name.

Cruz brings claims under 42 U.S.C. § 1983, asserting that Wollin and Smith violated his Fourth Amendments rights by (1) entering his backyard without a warrant; (2) questioning, handcuffing, and detaining him in a squad car; and (3) frisking him. Cruz also brings claims against the City of Adams, asserting that Wollin, who was the chief of police, had final policymaking authority for the city.

Cross motions for summary judgment are before the court. Dkt. 17 and Dkt. 20. Cruz moves for partial summary judgment on liability; defendants move for summary judgment on the entire complaint. The court will grant Cruz's motion and deny defendants' motion. Wollin and Smith lacked reasonable suspicion to believe that Cruz was the car crash suspect or that

he had committed any other crime, so it was unreasonable for them to enter his backyard, seize, and frisk him.

This case will proceed to trial on Cruz's damages.

UNDISPUTED FACTS

The following facts are undisputed.

On May 19, 2024, Keegin Neveln crashed his car in Columbia County, Wisconsin. The crash killed Neveln's girlfriend, who was a passenger in the vehicle, and Neveln fled the scene on foot. Police began looking for Neveln shortly thereafter.

Either the same day or early the next day, police in Portage, Wisconsin, received a call for a welfare check from an unknown female. The caller did not mention Neveln, but the police believed that the call might be related to him. (Neither side explains why the Portage police believed that.) Police identified the number as belonging to Colin Brandt and they located at least two addresses for Brandt, including one at 117 S Elm Street in Adams, Wisconsin.[1]

Because the Elm Street address was in a different county, the Portage police department forwarded information about the welfare check call to the Columbia County sheriff's department, which called the Adams County sheriff's department to ask if police there could check the Elm Street address for Brandt and Neveln. Dkt. 21-6. A dispatcher relayed this request to defendant Richard Smith of the Adams County police department, who was on

---

[1] As it turns out, the welfare check call had nothing to do with Neveln. Nor was the caller connected to Colin Brandt, who had recently gotten a new phone number. But the defendant officers did not know that at the time.

2

patrol near Brandt's house. The computer-aided dispatch (CAD) request that Smith received read in relevant part:

> CAD Call info/comments COSO [Columbia Sheriff's Office] is investigating a fatal crash from last night where the driver left the scene. They are requesting we attempt to locate Keegan Neveln and take him into custody for the crash. Per COSO, Portage PD received a request for a welfare check from a phone number belonging to Colin Brandt, and they could hear yelling in the background. Brandt and Neveln may be at 117 S Elm St. or 1095 CTH M. COSO was provided w/ additional possible addresses in Juneau and Marquette Counties,
>
> ****
>
> ATTENTION: DISPATCH/PATROL REFERENCE: ATL/WELFARE
>
> ADSO [Adams Sheriff's Office]: PLEASE CHECK ADDRESS FOR KEEGIN E NEVELN 03/17/1998 OR COLIN BRANDT AT 117 S ELM ST IN ADAMS OR 1095 COUNTY ROAD M. WE RECEIVED A CALL FROM COLIN'S PHONE NUMBER AND A WOMAN WAS SCREAMING ABOUT A WELFARE CHECK IN RELATION TO KEEGIN, IF LOCATED CHECK WELFARE AND ADVISE COSO. ALSO, WE HAVE AN ATL FOR KEEGIN ERIN NEVELN 03/17/1998. IF HE IS LOCATED PLEASE 1095 AND ADVISE IMMEDIATELY. REF COSO 12414541.

Dkt. 21-4, at 6. The dispatcher also spoke with Smith by phone, giving him the same information that was in the CAD request.

After receiving the dispatch request, Smith attempted to find out what Brandt and Neveln looked like. He checked the police department's system but found nothing. He also checked whether Neveln or Brandt had public Facebook profiles; he found no photos of Neveln, but he did find a photo of Brandt. Smith also learned that Brandt was in a relationship with a woman named Elizabeth Roberts, who Smith knew from a previous interaction.

Smith stopped at the Elm Street address and knocked on the front door. Plaintiff Enrique Cruz answered, and although Smith did not recognize him, he knew that it was not

3

Colin Brandt based on the Facebook photo he had seen. Smith introduced himself and asked to speak with Keegin and Colin. Cruz said that he did not recognize the name Keegin, but that Colin Brandt was his older brother. Smith did not ask Cruz to identify himself.

Cruz went back inside the house to look for Brandt. While he was gone, defendant Sam Wollin arrived. Wollin is the police chief for the City of Adams. In his deposition, Wollin did not recall whether he had talked to dispatch or seen the CAD request, but he knew that Smith had gone to the Elm Street address looking for an individual named Keegin Neveln who had fled a fatal motor vehicle accident in Columbia County. Dkt. 14 (Wollin Dep. 11:20–13:1).

Wollin checked in with Smith, who told him that "a male subject came to the door; stated, I believe, Colin was his brother; and then went back into the residence." *Id.* 15:18–21. Wollin believed that if Neveln was in the house, he might attempt to flee, so Wollin decided to go into the backyard to keep watch.

While Wollin was standing in the backyard, Cruz stepped out of the back door. Wollin identified himself and asked for Cruz's name. Cruz told Wollin to get off his property. Wollin asked for Cruz's name again and Cruz refused to give it. Wollin then told Cruz that he was going to be detained until they could get his identity sorted out. Wollin placed Cruz in handcuffs and walked him to the front of the house where the squad cars were parked. Cruz was physically cooperative throughout this encounter.

While Wollin was handcuffing Cruz in the backyard, Smith was at the front door speaking with Brandt's girlfriend Elizabeth Roberts.[2] Roberts told Smith that Brandt was at

---

[2] From this point on, there is footage of the incident from Smith's body camera. Dkt. 21-1. Smith testified in his deposition that he forgot to turn his bodycam on until he began speaking with Roberts.

work and that she didn't know who Keegin was. She also gave Smith Brandt's phone number, which she said Brandt had gotten within the last few months. Smith radioed dispatch to request the telephone number of the welfare check call, so he could determine whether it was the same number that Roberts had given him.

At this point, Smith saw Wollin walking toward the front of the house with Cruz, so he went to meet Wollin next to his squad car. Wollin conducted a pat down and removed Cruz's phone and keys from his pocket, and then he put Cruz into the back of the squad car. Dkt. 21-1, at 4:00–4:35. Wollin then went into the backyard again, while Smith returned to the porch. Smith asked Roberts who the individual in the squad car was, and she said, "that's Junior." *Id.* at 5:05. Smith asked for his real name, and Roberts said that she could not pronounce it but that his last name was Cruz. *Id.* at 5:26. Smith asked Roberts a few more questions about Brandt and then confirmed with dispatch that the telephone number of the welfare check call did not match Brandt's current number.

After finishing up with Roberts, Smith went to the backyard to tell Wollin what Cruz's identity was and that neither Brandt nor Neveln were in the house. Wollin and Smith walked back to the squad car and Wollin asked Cruz if he was "Junior"; Cruz responded, "yes, among other things." *Id.* at 7:28. Wollin then released Cruz. In total, Cruz was handcuffed for a little more than four minutes.

## ANALYSIS

Cruz contends that defendants violated his Fourth Amendment rights by entering his backyard and briefly detaining him. Summary judgment is appropriate if the moving party shows that there is no genuine dispute of material fact, and that the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the court evaluates each motion separately, construing the facts and drawing all reasonable inferences from those facts in favor of the nonmovant.[3] *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Here, the material facts are undisputed, so the case turns on the application of Fourth Amendment law to the undisputed facts. When the facts are undisputed, whether the officers acted within constitutional bounds is a question for the court. *Bell v. Irwin*, 321 F.3d 637, 640–41 (7th Cir. 2003).

The police encounter in this case began when Smith knocked on Cruz's front door and asked to speak with Keegin Neveln and Colin Brandt. The parties agree that that interaction did not violate the Fourth Amendment. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (police officers may approach a home and knock because that is "no more than any private citizen might do"). But Cruz contends that essentially everything that happened after that violated the Fourth Amendment. Cruz's claims fall into four categories: (1) unlawful seizure claims against Wollin and Smith for handcuffing and detaining him in a squad car; (2) unlawful frisk claims against Wollin and Smith for searching his pockets; (3) warrantless entry claims against Wollin for going into his backyard twice; and (4) a municipal liability claim against the City of Adams because Wollin had final policymaking authority for the city.

As a preliminary matter, defendants did not raise qualified immunity as a defense, either in support of their own motion for summary judgment or in opposition to Cruz's motion.

---

[3] Defendants did not file an opposition brief to plaintiff's motion for summary judgment, so the court is relying on the arguments they made in their own briefs and on their responses to Cruz's proposed findings of fact.

Accordingly, the qualified immunity issue is forfeited, and the court will not consider it. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009).

## A. Unlawful seizure claims

Cruz asserts that Wollin unlawfully seized him in violation of the Fourth Amendment by handcuffing him and briefly detaining him in a squad car. Cruz asserted two claims about this conduct in his complaint: first, that Wollin seized him without reasonable suspicion and second, that Wollin escalated the seizure to an unlawful arrest. But in his briefs, Cruz doesn't explain when the seizure escalated to an arrest, nor is it necessary for the court to decide that issue. As the court will explain, Wollin lacked reasonable suspicion for any sort of seizure, so it doesn't matter whether the seizure escalated into an arrest.

In his briefs, Cruz also doesn't say directly when the seizure started, nor did defendants address that issue. But the court takes the parties to be saying that the seizure began when Wollin told Cruz that he was going to detain him until the officers could determine his identity. The only thing that happened before that was Wollin asking for Cruz's name, which is not generally an action that constitutes a Fourth Amendment seizure. *Hall v. City of Chicago*, 953 F.3d 945, 951 (7th Cir. 2020).

Defendants contend that Wollin's seizure of Cruz was a valid investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968). Although some circuits have held otherwise, the Seventh Circuit has upheld *Terry* stops in the area immediately surrounding a home in at least some circumstances. *United States v. Segoviano*, 30 F.4th 613, 619 (7th Cir. 2022); *United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019). Under *Terry*, an officer can briefly detain someone for investigative purposes if the officer has a reasonable suspicion that the person is

7

about to engage in criminal activity or is wanted for past criminal activity. *Segoviano*, 30 F.4th at 619.

Reasonable suspicion means that an officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Reasonable suspicion is a lower standard than probable cause, but more than a mere hunch. *Richmond*, 924 F.3d at 411. The "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). When evaluating reasonable suspicion, courts must consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). A "divide-and-conquer analysis" that examines each factor supporting reasonable suspicion in isolation is not permitted. *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). This does not mean, however, that courts are barred from discussing the factors separately. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018). It simply requires that courts consider the reasonable inferences that an officer could draw from the objective facts in combination. *Id.*

Defendants say that Wollin had reasonable suspicion that Cruz might be Neveln, the man who had fled from the fatal car crash the night before. Defendants point to the following facts as the basis for Wollin's suspicion: the CAD dispatch request the officers received said that Neveln might be at the Elm Street address; Cruz was approximately the same age as Neveln; Cruz glanced behind Smith while talking to him as though he was "scanning for a way out of the situation"; Cruz refused to identify himself when Wollin asked his name; and Cruz

8

had his head covered with a hooded sweatshirt while he was talking to Wollin in the backyard. Dkt. 24, at 9.

The court concludes that these facts, neither individually nor collectively, do not support a reasonable suspicion that Cruz was Neveln. The fundamental problem is the vagueness of the CAD dispatch request, which gave Wollin virtually no facts linking the Elm Street address to Neveln.[4] An officer can make an investigatory stop based on a tip or other information obtained from an outside source, but only if the information bears sufficient indicia of reliability to justify relying on it, such as details that can be corroborated or information establishing the informant's basis of knowledge. *See Adams v. Williams*, 407 U.S. 143, 147 (1972); *Alabama v. White*, 496 U.S. 325, 330 (1990). The dispatch request stated that an anonymous woman had called from Colin Brandt's phone number to request a welfare check "in relation" to Keegin Neveln, so Brandt or Neveln "may be at 117 S Elm St. or 1095 CTH M." Dkt. 21-4, at 6. But a welfare check call "in relation to" Neveln does not suggest on its own that Neveln was at Brandt's house. Nor was it even clear that the Elm Street address was Brandt's house: the dispatch request listed both that address and 1096 County Highway M as possible locations for Brandt and Neveln. Further, once Smith and Wollin arrived at the Elm Street address, nothing that they found there corroborated the welfare check call, because nobody at that address appeared to be in distress or otherwise in need of a welfare check. At

---

[4] Both sides' reasonable suspicion arguments rely on an assumption that Wollin saw the dispatch request, even though he testified in his deposition that he did not remember whether he had seen it or whether he had simply talked to a dispatcher. Dkt. 14 (Wollin Dep. 11:20–12:9). But if Wollin had not seen the dispatch request, then he had even less information about the situation, and therefore, even less of a basis for reasonable suspicion.

that point, no reasonable officer would have relied on the information in the dispatch request as a basis to detain someone.

As for the observations that defendants made after they arrived at Cruz's house, these are exceptionally weak indicators that Cruz was Neveln. In his deposition, Smith explained that he found Cruz suspicious when he was talking to him at the front door, because Cruz "appear[ed] to be scanning the area behind [Smith] while [Smith] spoke with him," Dkt. 19-1 (police report), at 3, which Smith interpreted as Cruz "scanning for a way out of the situation." Dkt. 16 (Smith Dep. 25:9–10). Odd or evasive behavior can be relevant in a reasonable-suspicion analysis, *see United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010), but Smith's description of Cruz's behavior is too vague to be a useful indicator. Smith doesn't explain what Cruz was doing to "scan[] the area behind" him other than that Cruz was not making eye contact with him. Dkt. 16 (Smith Dep. 16:10–15). The Seventh Circuit has cautioned that avoidance of eye contact has "very little import to a reasonable suspicion determination," because many innocent people will do that upon being confronted by the police. *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013).

That leaves Cruz's refusal to identify himself and Wollin's observation that Cruz was approximately the same age as Neveln and was wearing a hoodie, which Wollin interpreted as a possible attempt to hide his identity. Cruz had no obligation to identify himself, and his refusal to do so did not furnish Wollin with reasonable suspicion to detain him. *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure"); *cf. Brown v. Texas*, 443 U.S. 47 (1979) (suspect's presence in high-drug area and refusal to identify himself did not provide reasonable suspicion for a detention). And Cruz's age and his wearing a hoodie are

10

both criteria that would apply to a "very large category of presumably innocent" individuals.[5] *Cole*, 21 F.4th at 435. If the other circumstances strongly suggested that Neveln was in the Elm Street house, then Wollin's encountering an unknown individual of the same age at that address could possibly have given rise to reasonable suspicion. But given the unsubstantiated connection between the address and Neveln, defendants' arguments amount to an assertion that anybody of the same general age as an at-large suspect could be subject to random detention based on little more than a hunch that they might be the suspect.

Defendants rely on *Moderson v. City of Neenah* to support a finding of reasonable suspicion, but that case is not instructive. 137 F.4th 611 (7th Cir. 2025). In *Moderson*, officers responded to a hostage situation involving a gunman who had fired shots at officers. When several hostages escaped, officers handcuffed them and transported at least two of them to the police station for questioning. The court held that the detention of the hostages was reasonable under the Fourth Amendment because the officers held the individuals no longer than necessary to ascertain that they were not the gunman. *Id.* at 616. But *Moderson* is easily distinguished, because in that case, the officers knew for certain that there was a gunman in the building the hostages had escaped from. In contrast, Wollin's suspicions were based on the vague and unsubstantiated welfare check call, which did not even suggest that Neveln was at the Elm Street house. The bottom line is that Wollin had no reason to assume that Cruz was Neveln based on the information from the welfare check call or from Cruz's innocuous behavior

---

[5] The body cam footage also shows that it was raining outside when Wollin was talking to Cruz, which provides an additional innocent explanation for why Cruz was wearing a hoodie. Dkt. 21-4.

during Wollin's interaction with him. The court will grant summary judgment to Cruz on his unlawful seizure claim against Wollin.

Cruz also brings a failure-to-intervene claim against Smith related to the unlawful seizure. A defendant may be held liable for failing to stop another officer's violation of the constitution if the defendant had reason to know that the other officer was violating the plaintiff's constitutional rights, and the defendant had a "realistic opportunity" to prevent the violation. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Smith was not present when Wollin initially decided to handcuff Cruz, but he joined Wollin shortly thereafter and was standing next to Wollin when Cruz was placed into the squad car. Plaintiff argues that Smith knew at this point that the only reason Cruz was being detained was because he had refused to give his identity, so Smith should have intervened to prevent the continuation of the unlawful detention. In response, defendants simply rehash their arguments that the seizure itself was not unlawful, which the court has already rejected. The court will grant summary judgment to Cruz on his unconstitutional seizure claim against Smith based on a failure-to-intervene theory.

## B.  Unlawful frisk claims

Cruz next contends that Wollin violated the Fourth Amendment by frisking him before detaining him inside the squad car. A frisk is justified under the Fourth Amendment during a *Terry* stop if the officer has a reasonable suspicion that the person is armed and dangerous. *Taylor v. Schwarzhuber*, 132 F.4th 480, 489 (7th Cir. 2025).

The court will grant summary judgment to Cruz on the unlawful frisk claim for the same reason as the unlawful seizure claim. Defendants sole argument why the frisk was justified was that Wollin believed Cruz was Neveln, who was wanted for a serious crime and who thus

might be armed. But the court has already explained that Wollin's belief that Cruz was Neveln was not reasonable under the circumstances. Wollin had no other reason to frisk Cruz, so the frisk was unconstitutional.

The court will also grant summary judgment to Cruz on his failure-to-intervene claim against Smith related to the unlawful frisk. Smith's bodycam shows that he was standing right next to Wollin while he was frisking Cruz, Dkt. 21-1, at 4:00–4:32, and plaintiffs say that Smith knew there were no facts that would justify a belief that Cruz was armed or otherwise dangerous. Defendants don't contest these points in their briefs, so they have forfeited the issue. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016).

## C. Warrantless entry claims

The right to be free from unwelcome intrusions into one's home is at the "very core" of the Fourth Amendment's protections. *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (internal quotations omitted). Therefore, home entries without a valid search warrant are presumptively unconstitutional, with only a few limited exceptions. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

Cruz's warrantless entry claims are based on Wollin's two entries into his backyard. The area immediately surrounding a home, otherwise known as the "curtilage," is generally considered part of the home for Fourth Amendment purposes. *Id.* Defendants concede that Cruz's backyard was part of the curtilage of his home and that Wollin did not have a warrant. But they say that the entry was justified by the exigent circumstances exception to the warrant requirement, which allow for warrantless entries if (1) there is probable cause to believe that a crime is being committed, and (2) exigent circumstances create an urgent need to enter the

home before a warrant could be obtained. *Jacobs v. City of Chicago*, 215 F.3d 758, 769 (7th Cir. 2000).

As with Cruz's other claims, defendants' exigent circumstances arguments rely on Wollin's belief that Neveln was at the Elm Street address. But the court has already determined that Wollin lacked reasonable suspicion that Neveln was there. Probable cause is a higher standard than reasonable suspicion, *Richmond*, 924 F.3d at 411, so the court's decision on the reasonable suspicion issue is dispositive of the probable cause issue as well. Cruz is entitled to summary judgment on his Fourth Amendment claims based on Wollin's entering into his backyard.

### D. Municipal liability

Cruz asserts a claim against the City of Adams for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Municipalities can be sued under this theory if the plaintiff alleges that he was harmed by a county policy or practice or by an official with final policymaking authority. *See, e.g.*, *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Cruz contends that Wollin was an individual with final policymaking authority, because he was the City of Adams' police chief. Defendants say that Wollin had administrative control over the police department but that he lacked final policymaking authority, because the mayor and common council had the final say on police department policies and procedures.

Final policymaking authority means that an individual has the "responsibility for making law or setting policy" on the issues relevant to a particular case. *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004) (internal quotations omitted). Mere discretionary authority to carry out municipal functions is not enough; the official must actually be the decisionmaker setting municipal policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481–82 (1986). To

14

determine whether a municipal official is a final policymaker, courts look to state and local law, including "relevant customs and practices having the force of law." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). Relevant factors include: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision is subject to meaningful review; and (3) whether a policy decision purportedly made by the official is within the official's grant of authority. *Id.* (internal quotations and citations omitted).

Defendants contend that Wollin lacked final policymaking authority because his decisions on police department policy were subject to override by the common council or the mayor. *See* Dkt. 15 (City of Adams 30(b)(6) Dep. 4:15–22; 9:9–15). But if a legislative or executive body formally has oversight authority but chooses to delegate that authority "as a matter of custom," the official to whom the authority is delegated is a final policymaker. *See Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999); *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 679 (7th Cir. 2009) (final policymaking authority is established if "all the evidence suggests that [an official] had . . . unfettered discretion"). Here, no reasonable jury could find that either the common council or the mayor constrained Wollin's authority. Wollin's job description stated that he was responsible for establishing a "standard operating policy and procedures manual" for police officers, but that policies and procedures "may require approval by the Common Council." Dkt. 21-11, at 1. But as a matter of practice, the common council fully delegated its authority to Wollin to decide what policies to adopt regarding investigative detentions, frisks, and home searches. The City of Adams contracted with a private company called Lexipol to draft policies for the police department, and Wollin reviewed the suggestions, made revisions, and had the final say on

15

what policies to include in the department's policy manual. *See* Dkt. 21-12 (defendant's interrogatory responses). Defendants admit that neither the common council nor the mayor were involved in reviewing Lexipol's draft policies or deciding what to include in the policy manual, Dkt. 15 (City of Adams 30(b)(6) Dep. 5:16–21), nor did they ever review Chief Wollin's decisions about police department policies. Dkt. 21-12.

Defendants have adduced no evidence that Wollin's decision-making on police department policies was constrained or reviewed by the mayor or the common council, so the court concludes that he is a final policymaking authority. The court will grant Cruz's motion for summary judgment on the *Monell* claim against the City of Adams.

## CONCLUSION

The court will grant plaintiff Enrique Cruz's motion for partial summary judgment, Dkt. 20, and deny defendants' motion for summary judgment, Dkt. 17. The court's decision resolves all issues related to liability. The case will proceed to trial on damages.

## ORDER

IT IS ORDERED that:

1. Plaintiff Enrique Cruz's motion for partial summary judgment, Dkt. 20, is GRANTED.

2. Defendants' motion for summary judgment, Dkt. 17, is DENIED.

Entered June 8, 2026.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

16